In the Matter of Vail W. PISCHKE, Debtor.

Vail W. PISCHKE, Debtor-in-Possession, Plaintiff,

v.

William G. MURRAY, Esquire, Chairman of the Creditors' Committee, GATX, C. J. Coakley, Samuel Greenbaum, Esquire, Boise Cascade, Bank of Virginia/Potomac, Fairfax County National Bank, First & Merchants National Bank, Virginia National Bank, LAM Associates, United Bank & Trust of Maryland, and Southern Arizona Bank & Trust, Defendants.

Bankruptcy No. 76–432–A.

United States Bankruptcy Court,
E. D. Virginia,
Alexandria Division.

June 18, 1981.

Roy B. Zimmerman, Alexandria, Va., for Vail W. Pischke.

William G. Murray, Arlington, Va., defendant, pro se.

John J. Czyzewski, Vienna, Va., for GATX Leasing Corp.

Terence P. Quinn, Vienna, Va., for C. J. Coakley.

Samuel M. Greenbaum, Greenbaum & Gins, Washington, D. C., defendant, pro se.

Dillard C. Laughlin, Stephen K. Christenson, Kendrick, Gearheart, Aylor & Lockowandt, Arlington, Va., for Boise Cascade.

Joseph V. Gartlan, Jr., Washington, D. C., and Jill R. Abeshouse, Alexandria, Va., for Bank of Virginia/Potomac. .

Randolph A. Sutliff, McCandlish, Lillard, Church & Best, Fairfax, Va., for Fairfax County Nat. Bank.

J. David Linthicum, Arlington, Va., for First & Merchants Nat. Bank.

Jonathan C. Kinney, Walter H. Hylton, III, Bean, Kinney, Korman & Hylton, Arlington, Va., for Virginia Nat. Bank.

Leslie R. Roos, Repetti, Deerin & Murphy, P. C., Washington, D. C., for LAM Associates.

United Bank & Trust Co. of Maryland, Oxon Hill, Md., C. Wynne Tolbert, David C. Canfield, Arlington, Va., for Southern Arizona Bank & Trust Co.

## MEMORANDUM OPINION

MARTIN V. B. BOSTETTER, Jr., Bankruptcy Judge.

This matter came on for hearing on a Complaint filed by the debtor-in-possession, Vail W. Pischke, the plaintiff herein, in a proceeding before this Court under Chapter XI of the Bankruptcy Act against William G. Murray, Esquire, and other named defendants[1] seeking a determination of the validity, priority or extent of various liens upon the plaintiff's property and for a valuation of each security. The defendants are holders of either judgment and execution liens against the plaintiff, or have executed loan agreements with the plaintiff (or with the plaintiff as guarantor) evidenced by the recordation of financing statements and security agreements. The plaintiff is a limited partner in a partnership known as First Charter Land Associates ("First Charter").

Two principal issues are presently before the Court for resolution. First, those of the defendants who hold judgment liens are seeking to satisfy their liens against the plaintiff's interest in First Charter. Arising out of this is a controversy among several of the defendants as to the status of their respective judgment liens. Two of the defendants, Fairfax County National Bank ("FCNB") and Bank of Virginia/Potomac ("BVP") contend that the order of priority for all of the judgment lien holders must be determined as of the date on which charging orders were issued. FCNB and BVP procured charging orders after the issuance of liens of *fieri facias* which levied on the interest of plaintiff in the limited partnership. The defendants who have failed to procure charging orders assert that a lien of *fieri facias* is sufficient to perfect their interests against the partnership interest of the plaintiff. These defendants contend ·that it is the date on which the writ of *fieri facias* is delivered to the sheriff for execution which is determinative of the priority between the holders of judgment liens.

A second issue to be resolved by the Court concerns the status of certain financing statements recorded by the defendants, C. J. Coakley and Samuel Greenbaum, Esquire. Several of the defendants argue that the defendant Coakley's financing statement was improperly filed and, hence, is ineffective against third parties. The defendant GATX Leasing Corporation ("GATX") asserts that Greenbaum's financing statement should not be considered as he failed to pursue his claim at trial other than to file an Answer to the plaintiff's complaint.

Set forth below are the names of the respective defendants, the amounts of their

---

1. GATX Leasing Corporation; C. J. Coakley; Samuel Greenbaum, Esquire; Boise Cascade; Bank of Virginia/Potomac; Fairfax County National Bank; Southern Bank & Trust Company; Virginia National Bank; LAM Associates; United Bank & Trust of Maryland; First & Merchants National Bank. The latter two defendants neither filed an Answer in this pro- ceeding nor did they make an appearance at trial on this matter. William Murray, Esquire, is the Chairman of the Creditors' Committee. Counsel for the plaintiff represented to the Court at the hearing on this matter that Mr. Murray has been included as a defendant only in his capacity as Chairman of the Creditors' Committee.

claims, the dates judgments were entered against the plaintiff, the dates of execution of liens of *fieri facias*, and the dates of issuance of charging orders, as follows:

| Claimant | Amount | Judgment | Fieri Facias | Charging Order |
|---|---|---|---|---|
| 1. Boise Cascade | 8,767.17 | 12/30/74 | 3/18/75 | |
| 2. Bank of Virginia/ Potomac | 89,049.43 | 7/24/75 | 10/ 3/75 10/30/75 | 5/ 4/76 |
| 3. GATX | 54,162.14 | 11/22/74 | 2/12/75 | 6/13/75 |
| 4. Fairfax County National Bank | 34,132.25 | 7/25/75 | 11/10/75 | 4/23/76 |
| 5. First and Merchants' Bank | 93,000.00 | 8/29/75 | 3/10/76 5/25/76 | |
| 6. Virginia National Bank | 86,104.80 | 10/ 7/75 | 2/17/76 | |
| 7. LAM Associates | 41,500.00 | 2/15/76 | 4/12/76 | |
| 8. Southern Arizona Bank & Trust Co. | 64,912.94 | 9/15/75 | 10/22/75 | |

The defendants Southern Arizona Bank and Trust Company ("Southern Arizona"), Boise Cascade, Virginia National Bank ("VNB") and GATX contend that the issuance of a writ of *fieri facias* and execution upon delivery to the authorized enforcement officer fully perfected their liens against the plaintiff's limited partnership interest in First Charter. These defendants contend further that a charging order is unnecessary to perfect a lien on a partnership interest under Virginia law, since for purposes of perfection the partnership interest is treated as an intangible and, hence, is considered perfected pursuant to Virginia Code § 8.01–501 (1977 Repl.). Under this view, a charging order is not regarded as either a lien-creating device or a lien-perfecting device. Rather, a charging order is seen as a lien-enforcement mechanism between judgment lien creditors of an individual partner and an equity-adjusting device between personal creditors of the partners and the creditors of the partnership.

The assertion is made by the aforesaid defendants that although there exists a specified statutory method of reaching a partnership interest of a judgment debtor, this does not mean that a judgment creditor who has a charging order relegates a prior lien to a position of inferiority to the charging order. These defendants argue that permitting a court of competent jurisdiction to charge the interest of a partner with payment of an unsatisfied judgment does not either directly or indirectly support the conclusion that the granting of a charging order gives a priority to the judgment creditor seeking the charging order as against the judgment creditors of the partner who do not have such charging orders.

■ The Court recognizes that under Virginia law the execution of a writ of *fieri facias* establishes a lien on intangibles from the time the writ is delivered to the sheriff. The case law is equally "clear that it is the creation of a lien and not its enforcement which is critical" in a bankruptcy setting. *In re Acorn Electric Supply, Inc.*, 348 F.Supp. 277, 279 (E.D.Va.1972).

■ Virginia has adopted the Uniform Partnership Act ("UPA"), Virginia Code § 50–1 *et seq.* (1980 Repl.) and the Uniform Limited Partnership Act ("ULPA"), Virginia Code § 50–44 *et seq.* (1980 Repl.).[2] The

2. In Virginia, "[a] limited partnership is one in which the liability of one or more, but not all,

of the partners is limited to the amount contributed by him or them to the firm capital at the

charging order provision appearing in Virginia Code § 50–65, as amended, is modeled on Section 22 of the ULPA and Section 28 of the UPA (*see* Virginia Code § 50–28, as amended). Paragraph (1) of Section 50–65 establishes a procedure by which a judgment creditor of a debtor who has a limited partnership interest in a partnership may satisfy his judgment from the debtor's partnership interest through the use of a charging order.[3] This method is virtually identical to the procedure set forth in the statute applicable to "non-limited" partnerships— Virginia Code § 50–28, *supra*.

It has been stated that a charging order statute "constitute[s] . . . repeal by implication of any previous procedures designed to" reach a partner's interest in a partnership. Gose, *The Charging Order Under the Uniform Partnership Act*, 28 Wash.L.Rev. 1, 20 (1953). An analysis of this principle considered in conjunction with the fact that it is the creation of the lien and not its enforcement which is critical in the bankruptcy setting indicates that the better and most logical application is that the Virginia charging order statute, as codified by the Legislature's adoption of the ULPA, supersedes other legislation in the area concerning satisfaction of a judgment creditor's claim against a partner's interest in a partnership.

It would appear that to date no case has construed Section 50–65 of the Virginia Code. The Legislature, in enacting the ULPA, recognized that the provisions of this Act should be interpreted and construed to effect uniformity with the decisions of the courts of those states which have enacted the ULPA. Virginia Code § 50–71(2) (1980 Repl.).

The Supreme Court of California in *Baum v. Baum*, 51 Cal.2d 610, 335 P.2d 481 (1959) construed that state's "non-limited" partnership charging order statute. The *Baum* court found that a charging order on a partnership interest replaced "levies of execution as the remedy for reaching such interests." *Id.* 335 P.2d at 483. In reaffirming the rationale enunciated in an earlier decision by a California intermediate appellate court, *Sherwood v. Jackson*, 121 Cal. App. 354, 8 P.2d 943 (1932), the court in *Baum, supra*, 335 P.2d at 483, determined that a creditor could not "levy attachment or execution on a partner's right in specific partnership property . . . or on his interest in the partnership . . . but may only, after first obtaining judgment, pursue the statutory remedy of seeking a charging order [under the applicable California statute]." The decisions of other courts are in accord with the line of reasoning enunciated in *Baum.*[4]

time of the formation of the partnership." 14A Michie's Juris., *Partnership*, § 94 (1978 Repl.). Unknown at common law, a limited partnership is purely a statutory creation and, when permitted by statute, authorizes individuals to contribute capital and share in the profits. Limited partners do not participate in the operation of the partnership. Because of a limited partner's unique status, he has been likened to a shareholder of the partnership rather than as a creditor. 60 Am.Jur.2d *Partnership*, § 370, p. 253, n. 9. This being the case, it is clear that the plaintiff, in his capacity as a limited partner in First Charter, has no interest in the property of the partnership. Rather, his interest is in a share of the profits of the partnership, if any, and it is this interest which the defendant judgment lien holders are seeking to levy upon.

3. Section 50–65 of the Virginia Code, as amended, provides in pertinent part:

"(1) On due application to a court of competent jurisdiction by any judgment creditor

of a limited partner, the court may charge the interest of the indebted limited partner with payment of the unsatisfied amount of the judgment debt; and it may appoint a receiver, and make all other orders, directions, and inquiries which the circumstances of the case may require."

4. In *Krauth v. First Continental Dev-Con, Inc.*, 351 So.2d 1106, 1107 (Fla.App.1979), the court considered the priority among judgment creditors who sought "to charge the [non-limited] partnership interest of their judgment debtor with payment of their unsatisfied judgments pursuant" to applicable Florida law. One of the creditors obtained a judgment and later sought a charging order against the debtor's interest in a partnership. Krauth also obtained a judgment against the debtor and sought to intervene in the other judgment creditor's suit as plaintiff. A default was subsequently entered against the debtor and the trial court, in a charging order, provided that the judgment

In a 1976 decision, *Evans v. Galardi*, 16 Cal.3d 300, 128 Cal.Rptr. 25, 546 P.2d 313 (1976), the Supreme Court of California, sitting In Bank, construed a statute essentially identical to Virginia Code § 50–65. The court determined that a judgment creditor "must obtain a charging order, rather than a writ of execution, to reach" the limited partnership interest of the debtor. *Id.* 128 Cal.Rptr. at 32, n. 12, 546 P.2d at 320, n. 12. The *Evans* court, 128 Cal. Rptr. at 33, 546 P.2d at 321, reaffirmed its earlier decision in *Baum v. Baum, supra*, and, in so doing, concluded that the operative provisions of California's codification of the charging order procedure under the ULPA and UPA, being virtually identical, should be given equal effect. Thus, the court in *Evans* found:

> "Where . . . the partnership is a viable business organization and plaintiff does not show that he will be unable to secure satisfaction of his judgment by use of a charging order or by levy of execution against the debtors' other personally owned property, there is no reason to

creditor was to receive any and all interest of the debtor in the general partnership and that Krauth was to receive any monies remaining for the satisfaction of his judgment. Krauth objected to this procedure on the grounds that the charging order should have provided for a *pro rata* division rather than giving the other judgment creditor a priority over him. The court in *Krauth* rejected this argument.

The *Krauth* court, at 1108, reasoned that determining the method of apportioning payment to judgment creditors of a partner's partnership interest is analogous to the method provided by statute for "determining priority among judgment creditors seeking execution on other kinds of personal property." This being the case, a judgment creditor who:

> "[F]irst . . . appl[ies] to a court of proper jurisdiction for a . . . charging order has priority for the full satisfaction of his judgment from the debtor's partnership interest. Other judgment creditors achieve priority according to the sequence in which they apply for charging orders. There is no pro rata apportionment of the partnership interest, *and it matters not when the judgments were entered nor what efforts may previously have been made to satisfy them by other means*."
> *Id.* (Emphasis added.) *See Buckman v. Goldblatt*, 39 Ohio App.2d 1, 314 N.E.2d 188 (1974).

permit deviation from the prescribed statutory process."
*Id.*

■ This Court notes there is no evidence in the record that any of the defendants holding judgment liens were precluded from seeking charging orders pursuant to Virginia Code § 50–65 and, in fact, several of the defendants did procure such charging orders. Accordingly, having carefully examined the record, the Court is of the opinion that the defendant judgment lien holders shall obtain priority, if at all, in the sequence in which they were granted charging orders by a court of competent jurisdiction.[5]

■ Having determined that a charging order supersedes the general procedure for execution on intangibles, the Court is not persuaded by the argument that compliance with Virginia Code § 8.01–501, *supra*, converts the one-year perfection for a lien on the plaintiff's intangibles (*see* Virginia Code § 8.01–505 (1977 Repl.)), into a permanent perfection by the plaintiff's intervening bankruptcy. Rule 11–44 of the Rules of

5. Paragraph (3) of Virginia Code § 50–65 provides that "[t]he remedies conferred by paragraph (1) of this section shall not be deemed exclusive of others which may exist." The Court is aware of a 1975 California appellate decision, *Evans v. El Dorado Improvement Company*, 46 Cal.App.3d 84, 119 Cal.Rptr. 889 (Cal.App.1975), which passed on that state's codification of an identical provision to Virginia Code § 50–65(3). The court in *Evans*, although recognizing the general rule that charging orders on a debtor's partnership interests had replaced levies of execution, nevertheless permitted execution to be had when the judgment debtors owned all the beneficial interest in the limited partnership. The court was of the view that not to permit a levy of execution under such circumstances would be unreasonable particularly as the statute itself provided that the charging order procedure was a non-exclusive remedy.

The Court notes, however, that this decision, on appeal, was later vacated by the Supreme Court of California in *Evans v. Galardi (El Dorado Improvement Company,* Third-Party Claimant and Respondent), *supra*.

The Court, under the facts presented in the case at bar, is of the opinion that the only appropriate remedy available to the defendant holders of judgment liens is that of a charging order.

Bankruptcy Procedure provides that the filing of a petition in bankruptcy effectively stays all actions and enforcement of liens against the debtor. Neither this rule nor any other rule provides that the expiration of an existing lien by force of state law will be stayed in favor of a creditor. However, Rule 11–44(d) does provide that "[t]he court may, for cause shown, terminate, annul, modify or condition such stay." If a creditor is desirous of obtaining a new *fieri facias* prior to its expiration then in force or a charging order from a court of proper jurisdiction, such a creditor had a means of relief available. Therefore, it would appear that the writs of *fieri facias*, issued on behalf of Boise Cascade, VNB, Southern Arizona Bank & Trust Company[6], LAM Associates, and First & Merchants Bank, expired upon the passing of one year from their respective return dates.[7]

We next consider whether the financing statements filed by the defendants Greenbaum & Coakley are valid.

First, with respect to the Greenbaum financing statement, GATX contends that even though Greenbaum proceeded to file an Answer he, nevertheless, failed to pursue his claim at the hearing and, therefore, his financing statement should not be considered by the Court. The Court finds this argument to be without merit.

**6.** In the alternative, Southern Arizona argues that if the Court determines that a charging order is essential to the preservation of its lien (notwithstanding the filing of a proof of claim), its claim should be upheld upon the basis that no determination of the amount owed to the plaintiff by a third person, as required by Virginia Code § 8.01–505, *supra*, has occurred. Southern Arizona contends that there is only outstanding an offer to purchase the interests of the plaintiff in First Charter Land Corporation, First Charter Land Associates, First Charter Service Corporation (and/or any other associated entities) that is contingent upon this Court's approval. Southern Arizona takes the position that as there has been no determination of a legally-enforceable indebtedness owed to the plaintiff, based upon his intangible interests in the First Charter entities, the one-year period within which it may take action to validate its existing execution lien as against a bona fide purchaser has not yet expired.
The Court is of the opinion that Southern Arizona has misconstrued the applicability of this condition in the instant matter. The provisions

Greenbaum filed with the Clerk's Office of this Court a Proof of Debt and Consent to Plan on July 21, 1977, wherein it was asserted that he held a secured claim against all of the petitioner's right, title and interest in one-fourth (¼) of one percent (1%) of his one-third (⅓) interest in a partnership known as First Charter Land Associates. Greenbaum's interest therein was to secure an unpaid balance of legal fees due and owing to his law firm in the sum of $2,456.25. The Court notes that appended to Greenbaum's Answer were the financing statements evidencing a pledge executed by the plaintiff to secure the aforesaid debt.

■ The contention is next raised that Greenbaum's financing statements expired prior to the date of hearing on this matter. The financing statements in question were filed and recorded with the Virginia State Corporation Commission on April 3, 1975, and with the Clerk of the Circuit Court for Fairfax County, Virginia, on April 4, 1975. The applicable Virginia statute is Virginia Code § 8.9–403(2) (Cum.Supp.1980) which provides in pertinent part:

"The effectiveness of a filed financing statement lapses on the expiration of the five-year period unless a continuation statement is filed prior to the lapse. If a

in Virginia Code § 8.01–505 relating to the determination of amounts due to the plaintiff (as a judgment debtor) from a third party is not applicable inasmuch as the plaintiff is the holder of the intangible interest involved and is not a creditor of First Charter.

**7.** The Court is not persuaded by the argument asserted by Southern Arizona and Boise Cascade that when the plaintiff filed his petition in bankruptcy Section 67(c)(1)(B) of the Bankruptcy Act (11 U.S.C. § 107(c)(1)(B)) was thereby triggered. This provision invalidates only *statutory* liens. One well-recognized authority on bankruptcy states unequivocally that judgment liens and other "liens arising from judicial proceedings are not statutory liens" within the purview of Section 67(a–c) of the Bankruptcy Act. 4 *Collier on Bankruptcy*, ¶ 67.20[2], p. 216 (14 ed. 1978). Thus, given the distinction between judicial and statutory liens, the rationale and case law relied upon by Southern Arizona and Boise Cascade involving *mechanic's liens* are not applicable in the case at bar.

security interest perfected by filing exists at the time insolvency proceedings are commenced by or against the debtor, the security interest remains perfected until termination of the insolvency proceedings and thereafter for a period of sixty days or until expiration of the five-year period, whichever occurs later."

The plaintiff filed his petition on May 28, 1976. No party to this proceeding has asserted the position that the law as it existed prior to 1974 (which did not incorporate the referenced language regarding insolvency proceedings as tolling the requisite five-year period) is applicable to the financing statements filed by Greenbaum in 1975. Accordingly, having reviewed all the facts before it, the Court finds that Greenbaum's financing statements remain properly perfected under Virginia Code § 8.9–403(2), *supra.* It follows, therefore, that the Court must conclude that inasmuch as Greenbaum filed and recorded his financing statements prior to the time any of the judgment lien holders secured charging orders his interest is superior to that of the aforesaid claimants.

We next turn to the argument asserted by GATX, LAM Associates, FCNB, Southern Arizona and BVP that the Coakley financing statements are invalid and, as such, they should not be considered in determining the priority of liens among the judgment lien holders.

The Court notes that Coakley loaned the Valley Land and Development Corporation ("Valley Land") the sum of $215,590.07 on May 31, 1974. On June 21, 1974, the plaintiff guaranteed this loan by executing a "Corrected Guarantee and Assignment" ("Guarantee") which forms the basis for Coakley's claim. The plaintiff secured the Guarantee by pledging a six-tenths (⁶⁄₁₀) interest of his limitation partnership interest in First Charter Land Associates. The financing statements filed by Coakley speci-

fied that the maturity date of the Valley Land loan guaranteed by the plaintiff was September 28, 1974.

Evidence was had at the hearing that Valley Land defaulted on repayment of the Coakley loan on September 28, 1974. Upon default by Valley Land, the petitioner became primarily liable to satisfy the loan obligation pursuant to the terms and conditions of the Guarantee.

Coakley filed financing statements with the Clerk of the Circuit Court for Fairfax County, Virginia, on July 22, 1975, and with the Virginia State Corporation Commission on July 23, 1975. Coakley maintains that these financing statements evidence his rights under the Guarantee. By virtue of the financing statements and the Guarantee appended thereto (acting as a security agreement), Coakley's six-tenths interest in the petitioner's partnership interest, if found to be valid, would supersede the liens of several of the judgment lien holders.[8]

A further issue here arises out of the controversy as to whether several provisions of the Virginia codification of Article Nine of the Uniform Commercial Code, effective July 1, 1974, govern in this proceeding. Coakley maintains that the most recently enacted version of Section 8.9–402 of the Virginia Code is operative. The applicability of this section to the facts in the case at bar is governed by the transition provision for the 1973 Amendatory Act codified at Virginia Code § 8.11–103 (1980 Cum.Supp.).

The parties to this proceeding assert two differing interpretations of this transition provision. FCNB and BVP take the position that Virginia Code § 8.11–103, *supra,* does not contemplate the enforcement of preamendment transactions entered into but not perfected until after the effective date of the amended Code. This section states, in pertinent part:

---

**8.** GATX contends that since Coakley participated in a hearing as a party in the District Court for this district which resulted in the issuance of a charging order that specified that GATX's lien was superior to the unrecorded assignment to Coakley by the plaintiff, Coakley is precluded under the doctrine of *res judicata* from asserting a higher priority as a secured claimant than GATX. Having concluded that Coakley's financing statements are invalid, the Court declines to address this issue.

"Security interests arising out of such transactions which are perfected when this act of nineteen hundred seventy-three becomes effective shall remain perfected until they lapse as provided in this act of nineteen hundred seventy-three, and may be continued as permitted by this act of nineteen hundred seventy-three. . . ."

FCNB and BVP contend that the inference to be drawn from this language of the Virginia Code § 8.11–103, *supra*, is that a security interest arising from a preamendment transaction which is not perfected until after the effective date of the amended Code may not benefit from the transition features stated therein. Their interpretation of the phrase "[s]ecurity interests arising out of such transactions which are perfected when this act . . . becomes effective" requires that a preamendment transaction, to have the benefit of the more liberal lapse provisions under the amended Code, must be duly perfected prior to July 1, 1974. This they contend clearly was not accomplished by Coakley as the latter did not record his putative financing statements until 1975.

By way of rebuttal, Coakley refers the Court to the following language found in Virginia Code § 8.11–103, *supra*, which states:

"Transactions validly entered into on and after January one, nineteen hundred sixty-six and before July one, nineteen hundred seventy-four, and which were subject to the provisions of Titles 8.1 through 8.10 as amended through nineteen hundred seventy-two and which would be subject to this act as amended if they had been entered into after the effective date of this act and rights, duties and interests flowing from such transactions remain valid after the latter date and may be terminated, completed, consummated or enforced as required or permitted by this act of nineteen hundred seventy-three. . . ."

Coakley argues that FCNB and BVP improperly interpreted the transition provisions of Virginia Code § 8.11–101 *et seq.*

He takes the position that FCNB and BVP are confusing the terms "perfection" and "valid transaction" as they are incorporated into Virginia Code § 8.11–103, *supra*. Coakley submits that the Valley Land loan and the Guarantee executed by the plaintiff were valid transactions entered into after January 1, 1966 and before July 1, 1974, which were subject to Titles 8.1 through 8.10 of the Virginia Code, as amended through 1972. He asserts that the rights, duties and interests flowing from the loan and the Guarantee transactions remain valid after July 1, 1974 and such transactions "may be terminated, completed, consummated or enforced as required or permitted" under the 1973 Amendatory Act. Coakley maintains that his failure to perfect the security interest did not invalidate the transaction; but, rather, it only subordinated his interest to persons granted a priority under Virginia Code § 8.9–301, as amended.

■ The Court having carefully examined Section 8.11–103 of the Virginia Code is of the opinion that the last sentence of this provision is dispositive of the issue presented by the parties for resolution. The proper construction of this provision is that a security interest arising from a transaction validly entered into and perfected prior to July 1, 1974 will remain perfected under the amended version of the Virginia Code. However, under the facts of the present case, where the Valley Land loan agreement was entered into on May 31, 1974 (and later modified by the Guarantee executed by the plaintiff on June 21, 1974) and not perfected until July 1975, Coakley may not assert any benefit derived from the amended provisions of the Virginia Code under the 1973 Amendatory Act.

■ Having determined that the provisions of the 1973 Amendatory Act are not applicable to the case at bar, we next turn to the present status of Coakley's financing statement. The applicable Virginia statute governing the question of perfection is Section 8.9–403(2) of the Virginia Code in effect prior to July 1, 1974. This section provides in pertinent part:

"(2) A filed financing statement which states a maturity date of the obligation secured of five years or less is effective until such maturity date and thereafter for a period of sixty days.... The effectiveness of a filed financing statement lapses on the expiration of such sixty-day period after a stated maturity date or on the expiration of such five-year period, as the case may be, unless a continuation statement is filed prior to the lapse. Upon such lapse the security interest becomes unperfected...."

Evidence had at the hearing indicates that the Guarantee executed on June 21, 1974 was intended to secure a debt which was to mature on September 28, 1974. The security interest held by Coakley would have remained perfected for a period of sixty days beyond this maturity date had he filed a timely financing statement. There is no evidence in the record that Coakley filed a continuation statement prior to the lapse of his security interest. This being the case, the Court must conclude that "[u]pon such lapse the security interest" held by Coakley clearly was unperfected.

Nor is the Court persuaded by the argument advanced by Coakley that the manner in which he filed his financing statement constitutes a properly-perfected security interest. A form of financing statement was stapled to and filed with the Guarantee. Coakley contends that this is sufficient to constitute a security agreement. Also appended to the form of financing statement was a statement of collateral. Information contained in the form of financing statement includes the names and addresses of the plaintiff and Coakley, Coakley's signature, as well as references to the attached collateral statement and security agreement (the Guarantee). The financing statement is not signed by the guarantor Pischke.

An essential prerequisite to the perfection of a security interest is the filing of a financing statement. A properly-perfected security interest takes priority over a subsequent lien creditor. However, where such a security interest is unperfected, the subsequent creditor prevails. The Court has previously determined that Coakley may not rely upon the transition provision of the 1973 Amendatory Act which became effective on July 1, 1974. Therefore, to be valid, the financing statement must comply with the requirements set forth in Section 8.9–402(1) of the Virginia Code prior to its amendment under this Act. This section provides that the financing statement must contain the names and addresses of the debtor and secured party, the debtor's and secured party's signature[9] and a description of the collateral.

It is uncontroverted by the parties that the form of financing statement, standing alone, is not sufficient to perfect Coakley's security interest in the absence of the debtor's signature. Virginia Code § 8.9–402(1) does, however, provide an alternate method by which a security interest may be deemed properly perfected, to wit: "A copy of the security agreement is sufficient as a financing statement if it contains the above information and is signed by both parties."

Thus, the Guarantee, although signed by the plaintiff, lacks other essential requirements as set out above. Coakley asserts that the information contained in the Guarantee and form of financing statement appended thereto cures the deficiencies in each of the documents with respect to the requirements set forth in Virginia Code § 8.9–402(1). More specifically, Coakley contends that the absence of the plaintiff's signature on the form of financing statement is cured by attaching the Guarantee thereto.[10]

9. The Court notes that the only significant change in the version of the Virginia Code § 8.9–402(1) in effect as of July 1, 1974 is the deletion of the requirement that a secured party sign the form of financing statement or on a security agreement substituted for and filed as a financing statement.

10. The Court finds a 1966 decision relied upon by Coakley, *In re McCroskey*, 4 U.C.C.Rep. Serv. 237 (S.D.Ohio 1966) to be distinguishable from the facts present in the case at bar. A review of the facts in *McCroskey* reveals that a financing statement, which lacked the debtor's signature, was found to meet the signature requirement. However, the court so found be-

The court in *In the Matter of Maple Contractors, Inc.*, 172 N.J.Super. 348 411 A.2d 1186, 1190 (N.J.Super.1979) addressed this issue as requiring a determination as to whether the absence of a debtor's signature "on either the financing statement or a valid security agreement attached thereto [was] fatal to the creation of a valid lien by a creditor." The court held that where there has "not been compliance with the mandatory requirement of a signature of the debtor on the financing statement or on any valid document between the parties attached thereto" a creditor's security interest will not be deemed perfected. *Id.* 411 A.2d at 1192. Implicit in this decision is the requirement that a valid security agreement contain "all the proper information and signature of the debtor" as set forth in Section 9–402(1) of the Uniform Commercial Code. *Id.* 411 A.2d at 1191.

The Supreme Court of Mississippi squarely addressed the issue at hand in *Travelers Indemnity Company v. First National Bank of Jackson*, 368 So.2d 836 (Miss.1979). The court, at 838, held that the stapling of an indemnity agreement (filed as a security agreement) containing the signature of the debtor to a financing statement did not cure the omission of the debtor's signature on the latter document. Nor did the secured party's signature on the financing statement cure the omission of that party's signature on the security agreement.

In addition to the referenced case law, the Court is of the opinion that the public policy rationale behind the filing of a financing statement and the mandatory requirement that a debtor sign this document are supportive of a finding that Coakley's security interest is not properly perfected.

It is well established that the provisions of the Uniform Commercial Code are to be liberally construed in order to effectuate their purpose. Virginia Code § 8.1–102(1), as amended. It may be stated that the broad public policy rationale behind the filing of financing statements is to incorporate a uniform system of "notice filing." *Official Comment to Virginia Code § 8.9–402.* This system "contemplates further inquiry in order to determine whether a given asset is covered by a security agreement." *In re Varney Wood Products, Inc.*, 458 F.2d 435, 437 (4th Cir. 1972). Thus, a financing statement only need be "sufficiently descriptive so as reasonably to generate further inquiry." *Id.*

In evaluating the efficacy of the "notice filing" requirements in a particular situation, the requirement that the debtor sign the financing statement should not be minimized. The few cases which have considered whether the absence of a debtor's signature on a financing statement may still render it valid have determined that such an omission is not a minor error.[11] *Southwest Bank of Omaha v. Moritz*, 203 Neb. 45, 277 N.W.2d 430 (1979); *In the Matter of Maple Contractors, Inc., supra; The Travelers Indemnity Company v. First National Bank of Jackson, supra; Provident Finance Company v. Beneficial Finance Company*, 36 N.C.App. 401, 245 S.E.2d 510 (1978) *petition for review denied*, 295 N.C. 549, 248 S.E.2d 728 (1978); *In re Industro Transistor Corp.*, 14 U.C.C.Rep. Serv. 522 (E.D.N.Y.1973).

The North Carolina Court of Appeals in *Provident Finance Company v. Beneficial*

---

cause the security agreement (a real property lease) appended to the financing statement fully complied with the applicable U.C.C. provisions, thus rendering the deficient financing statement "mere excess".

Nor is the Court persuaded by Coakley's reliance on a formal opinion of the Attorney General of Alabama which is reported at 4 U.C.C.Rep.Serv. 126 (1967). The sole issue presented in this opinion was the fee the court clerk should charge when a financing statement and security agreement were filed together. The opinion addressed only the requirement of accepting these documents for filing.

It clearly did not address itself to the validity of the lien. In any event, the opinion was an advisory one and, as such, should not be accorded undue weight.

11. Section 8.9–402(5) of the Virginia Code in effect prior to July 1, 1974 (and carried over in the latest version of the Virginia Code at § 8.9–402(8)), provides that "[a] financing statement substantially complying with the requirements of this section is effective even though it contains minor errors which are not seriously misleading."

924

*Finance Company, supra,* 245 S.E.2d at 515, observed that under U.C.C. § 1–201(39), the term "signed" is liberally defined as "any symbol executed or adopted by a party with present intention to authenticate a writing." [12] The *Provident Finance Company* court determined that "in cases dealing with the *debtor's* signature on financing statements, the courts should apply this liberal definition with caution." Although some courts have liberally applied the signature requirement on financing statements with respect to the secured party's signature, the omission of the debtor's signature has been more strictly scrutinized. This difference in degree of scrutiny is explained by one commentary on the Uniform Commercial Code:

"We have found no case construing the official version of 9–402 in which a court found a financing statement to be effective despite the absence of the signature of the debtor. If the debtor's signature is omitted the financing statement is ineffective...."

J. White and R. Summers, *Uniform Commercial Code,* 835 (1972).

The court in *In the Matter of Maple Contractors, Inc., supra,* 411 A.2d at 1191 concurs with the view taken by the *Provident Finance Company* court. The *Maple Contractors, Inc.,* court stated that a stricter view must be had in evaluating compliance with the mandatory requirement that a debtor sign the financing statement. The court in *Maple Contractors, Inc.,* also made the observation that:

"All other documents which are of legal and economic consequence require that element of authorization, the personal authentication which formalizes assent to the legal consequences. It is a question separate and apart from the issue 'notice' and thus one which should not be disposed of based on a doctrine grounded peculiarly on the issue of notice. Clearly, the requirement by the Legislature of the debtor's signature does not further any

'notice' objective. Its necessity is, rather, grounded in the purpose of evidencing assent and preventing fraud. Regardless of whether there was any understanding between the parties regarding this financing statement, it was not formalized by a signature of the party to be held."

The necessity for distinguishing the principles underlying the notice filing theory from the mandatory signature requirements of U.C.C. § 9–402(1) was underscored in *In re Industro Transistor Corp., supra,* where a photocopy of the debtor's signature on an equipment schedule annexed to a financing statement was found to be insufficient. The court in *Industro Transistor Corp., supra,* 14 U.C.C.Rep.Serv. at 524, held that "[t]he absence of the debtor's signature [could not] properly be construed as a minor error inasmuch as the stated purpose of the signature [was] not notice to third parties but rather to authenticate the statement." The resulting system may, therefore be described as one "of authenticated notice filing." *In re Carlstrom, supra,* 3 U.C.C.Rep. Serv. at 771.

The Court observes that the Guarantee and the form of financing statement were drafted over a year apart. Thus, the financing statement cannot be properly construed as constituting a cover sheet for the Guarantee acting as a security agreement. The record in the present case indicates that the plaintiff, by executing the Guarantee, did so without any independent awareness of the financing statement.

Counsel for the plaintiff, Roy B. Zimmerman, Esquire, testified at the hearing that although Coakley did proffer a financing statement for the plaintiff to execute, this financing statement was never signed by him. The plaintiff's counsel testified further that the plaintiff would only execute the proffered financing statement upon receiving certain assurances from Coakley. Testimony had at the hearing indicates that Coakley failed to reach an agreement with the plaintiff and, thus, the financing statement was never executed.

**12.** This definition has been adopted verbatim in Virginia. Virginia Code § 8.1–201(39) (1965 Added Vol.).

■ The Court is of the opinion that the plaintiff did not intend that a recordable security interest be created when he executed the Guarantee. The Court must conclude, therefore, that the form of financing statement and Guarantee should not be considered as one document. Thus, each document must be analyzed separately to determine whether all the statutorily-required information is present in either document so as to satisfy the perfection provisions of the Virginia Code. Having so examined these documents, the Court finds that neither document, standing alone, constitutes a properly-executed financing statement.

For the reasons set forth herein, the Court is of the opinion that the various documents filed by Coakley as a financing statement are without effect, and that his security interest, if any, does not take priority over the claims of Greenbaum and those defendants possessing charging orders.

An appropriate Order will enter.